# STATE OF NORTH CAROLINA

_____Chatham_____ County

In The General Court Of Justice
☐ District ☒ Superior Court Division

| | |
|---|---|
| *Name Of Plaintiff*<br>Strata Solar, LLC<br>*Address*<br>50101 Governors Drive #280<br>*City, State, Zip*<br>Chapel Hill, NC 27517 | **CIVIL SUMMONS**<br>☐ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)**<br><br>G.S. 1A-1, Rules 3, 4 |
| **VERSUS** | *Date Original Summons Issued* |
| *Name Of Defendant(s)*<br>Erico International Corporation | *Date(s) Subsequent Summons(es) Issued* |

## To Each Of The Defendant(s) Named Below:

| | |
|---|---|
| *Name And Address Of Defendant 1*<br>Erico International Corporation<br>34600 Solon Road<br>Solon, Ohio 44139 | *Name And Address Of Defendant 2* |

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| | | |
|---|---|---|
| *Name And Address Of Plaintiff's Attorney (If None, Address Of Plaintiff)*<br>John W. Reis<br>Smith Moore Leatherwood<br>101 N. Tryon Street, Suite 1300<br>Charlotte, NC 28246 | *Date Issued*<br>7/9/15 | *Time*<br>3:40 ☐ AM ☐ PM |
| | *Signature*<br>Naree Whitaker | |
| | ☐ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court | |

| | | |
|---|---|---|
| ☐ **ENDORSEMENT (ASSESS FEE)**<br>This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | *Date Of Endorsement* | *Time* ☐ AM ☐ PM |
| | *Signature* | |
| | ☐ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court | |

**NOTE TO PARTIES:** *Many counties have MANDATORY ARBITRATION programs in which most cases where the amount in controversy is $15,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

AOC-CV-100, Rev. 6/11
© 2011 Administrative Office of the Courts

(Over)

**EXHIBIT**
**1**

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason.

| Service Fee Paid $ | Signature Of Deputy Sheriff Making Return |
|---|---|
| Date Received | Name Of Sheriff (Type Or Print) |
| Date Of Return | County Of Sheriff |

AOC-CV-100, Side Two, Rev. 6/11
© 2011 Administrative Office of the Courts

STATE OF NORTH CAROLINA

CHATHAM COUNTY

STRATA SOLAR, LLC,

Plaintiff,

v.

ERICO INTERNATIONAL CORPORATION,

Defendants.

GENERAL COURT OF JUSTICE

SUPERIOR COURT DIVISION

CIVIL ACTION NO. 15-cvs-

**COMPLAINT FOR DAMAGES**
(jury trial demanded)

Plaintiff, Strata Solar, LLC, through undersigned counsel, hereby sues Defendant, Erico International Corporation, and avers as follows:

## THE PARTIES

1. Plaintiff, Strata Solar, LLC is and has been at all material times a limited liability company organized and existing under the law of the State of North Carolina with a principal address of 50101 Governors Drive #280, Chapel Hill, NC 27517.

2. Defendant Erico International Corporation is and has been at all material times a corporation organized and existing under the laws of the State of Ohio with its principal place of business located at 34600 Solon Road, Solon, Ohio 44139, phone: 1-440-248-0100, the registered agent to which is William A. Fullmer, 31700 Solon Road, Solon, Ohio 44139.

## VENUE AND JURISDICTION

3. Venue and jurisdiction are proper in this Court because the damages alleged in this action arise from transactions, including sales and/or service work, that occurred at a solar farm located at 199 Vickers Road, Chapel Hill, NC in Chatham County, North Carolina, the damages are in excess of $10,000.00, and the Defendant sells products like the products in question to consumers in Chatham County, North Carolina.

4.     Venue in this District is proper in that the actions and activities giving rise to the plaintiffs' claims occurred within Chatham County.

5.     This Court has personal jurisdiction over this defendant under North Carolina's "Long Arm Statute," N.C.G.S. 1-75.4 in that this action involves damages that were incurred in the State of North Carolina and the action:

(a)     arises out of an act or omission within the State of North Carolina; and/or

(b)     arises out of an act or omission outside this State by the defendant, and in addition that at or about the time of the injury either:

1.     Solicitation or services activities were carried on within this State by or on behalf of the defendant;

2.     Products, materials or thing processed, serviced or manufactured by the defendant were used or consumed, within this State in the ordinary course of trade; or

6.     Subjecting this defendant to the jurisdiction of this Court does not offend traditional notions of fair play and substantial justice in that this defendant purposefully availed itself of the laws of the State of North Carolina by:

(a)     designing the product that is the subject of this action for the North Carolina market;

(b)     advertising in and/or to the North Carolina market;

(c)     establishing channels for providing regular advice to users or consumers of this product in the State of North Carolina;

2

(d)     marketing this and other products through a distributor who has agreed to serve as a sales agent, retailer, or dealership in the State of North Carolina;

(e)     shipping products to persons in the State of North Carolina for use by contractors, consumers and homeowners; and/or

(f)     otherwise engaging in continuous and systematic contacts with the State of North Carolina as may be developed through discovery.

## FACTS

7.     Plaintiffs hereby incorporate and adopt the allegations contained in the above paragraphs.

8.     On August 5, 2014, an electrical event took place at a solar farm owned and operated by Strata Solar, LLC at 199 Vickers Road, Chapel Hill, NC.

9.     The solar farm has several transformer stations several hundred feet apart from each other.

10.    Each transformer station involves a bus bar wireway (also known as a raceway) that connects the transformer box to an inverter box.

11.    The transformer station at issue, and the wireway that connects the transformer box to the inverter box, is shown in the below photo:

3



12.     The electrical event at issue originated from a failure at one such transformer station, station A3, within the wireway, specifically in a flexible bus bar system that was inside the wireway and which connected the transformer to the inverter.

13.     The flexible bus bar system that was used was a product called FLEXIBAR manufactured by Erico International Corporation (hereinafter "ERICO").

14.     The FLEXIBAR product was sold to Strata Solar, LLC through City Electric Supply Company dba Tamlite Lightning USA (hereinafter "City Electric").

15.     City Electric, in turn, arranged for ERICO to provide the FLEXIBAR product to Strata Solar, LLC and to have a representative of ERICO appear on site to demonstrate how to install the product.

4

16.     The purpose of the flexible bus bar system, as represented to Strata Solar, LLC, was to bypass the need to use an underground cable system under the concrete slab that connects the inverter station to the transformer station (which are only about 7 ½-feet apart) at the two transformer stations.

17.     The transformer stations were each designed to a capacity of approximately 1,200 volts.

18.     In late May 2014, ERICO representatives named Joe Campannelli and Doug Newton went to the above solar farm, known as Vickers farm, and demonstrated how to install three runs of FLEXIBAR product inside one wireway or raceway at the transformer stations, using three 3-meter long runs of FLEXIBAR.

19.     This demonstration started at the inverter station known as A3, which is the one where the failure would ultimately occur.

20.     Although the distance between the inverter and transformer is about 7 ½ feet, there are additional lengths the bus bar would need to travel to make the connections and the total length needed was in excess of the 3-meter length of FLEXIBAR.

21.     Because the length of each FLEXIBAR was not long enough to make the full connection from inverter to transformer, ERICO opted to create a splice at one end of each FLEXIBAR using a clamping system that involve two square plates connected by four bolts.

22.     The four bolts would clamp around, and not through, the actual electrical connections.

5

23.    The following photos show this clamp-and-bolt splicing system:





24.    It would turn out that this clamping system was a make-shift one, not previously tested or used for this application in this configuration.

25.    ERICO has an alternative splicing system, but it calls for the specialized "splice bars" and "splice plates" designed so that the bolts to pass directly through the metal bars, which appears to create a better connection than the make-shift one at issue.

26.    This alternative splicing system is shown in literature found on ERICO's website for "Telecom Ground Bars," as follows:

6



# Telecom Ground Bars

### TGB & TMGB Telecom Ground Bar Splice Kits
- Includes 2 tinned copper splice plates and stainless steel fasteners

TGB Splice Kit

TMGB Splice Kit

| Part No. | Width (in) | Length (in) | Material |
|---|---|---|---|
| TGBSPLICEKIT | 1/4 | 2 | Tinned Copper |
| TMGBSPLICEKIT | 1/4 | 4 | Tinned Copper |

27.    The make-shift clamping system at issue had not been tested for this particular application to determine the long-term efficacy of the splice in avoiding hot spots in a 1,200-volt system of this length within a wireway or raceway.

28.    ERICO also has at least three systems for clamping the FLEXIBAR to other non-FLEXIBAR products, as shown in the below photo from its literature:

7



29.     However, the above clamping systems are different from and for a different use than the make-shift clamp splicing system used for the transformer at issue.

30.     The representatives of ERICO also advised Strata Solar employees that they should heat shrink a sleeve to the make-shift clamp splicing system.

8

31.     The sleeving system involved the use of a black polymer sleeve that would be placed around the two metal plates and four bolts that comprised the make-shift clamp splicing system, whereby the black polymer sleeve was heated externally to shrink wrap the sleeve around the splice as insulation.

32.     Below is a photograph of how the sleeving system would appear after it had been shrink wrapped onto the make-shift clamp splicing system, this photo having been taken at station at issue, before the subject event:



· 33. ·    This shrink wrap process, however, did not account for whether there might be damage to the sleeving system by virtue of the sharp edges of the metal clamps or bolts that comprised the make-shift clamping system.

34.     ERICO apparently did not design or provide or recommend anything to protect the edges of the bolts.

9

35. ERICO did not design or provide or recommend anything to protect against metal from the clamping system breaking through the sleeve and contacting the interior metal of the wireway.

36. At the demonstration and training session of late May 2014 at transformer station A3, where the electrical event would later occur, the ERICO representatives gave instructions to employees of Strata Solar, LLC on how to connect the ends of the FLEXIBAR lengths to the inverter and transformer and what torques to apply in making those connections.

37. At this same demonstration and training session, the ERICO representatives also gave instruction on how to make the splice on the make-shift clamp-and-bolt splicing system.

38. When the bolts were turned and torqued to ERICO's specifications, the location of position of the bolts were marked and photographed, as shown, for example, in the photographs at paragraph 23.

39. The ERICO representatives advised the Strata Solar workers how to apply the polymer sleeves at the clamp splice connection and the Strata Solar workers shrink-wrapped the sleeves at those connections in accordance with those instructions.

40. The Strata Solar employees photographed the results of the shrink-wrap process on May 30, 2014.

41. Prior to the subject electrical event, all connections at the subject inverter station and the two others near it were done at the direction of the ERICO representatives and pursuant to their instructions.

10

42.     Between the date of May 30, 2014 and the morning of August 4, 2014, which is the date of the subject electrical event, the three inverter stations on the Vickers Farm location had been energized, though they had not been commissioned by the manufacturer of the inverter, which means that although the FLEXIBAR runs had voltage to them, there was no current running through them yet until the commissioning of August 5, 2014.

43.     On the morning of August 5, 2014, SMA America, LLC, the manufacturer of the SMA inverters to the three inverter stations, inspected and commissioned the inverters, starting with inverter station A3, then A2, then A1, turning on the switches to those inverters stations that morning, such that the FLEXIBAR runs now had current running through them.

44.     Within hours after the commissioning of the inverter stations, the data recorder to inverter station A3, which is the subject transformer station, indicated that an electrical event happened at the subject transformer station, A3.

45.     A Strata Solar worker was also on site late that afternoon and noticed blackening and heat at the bus bar at the subject transformer station.

46.     ERICO was put on notice very soon after this event and had representatives come on site.

47.     The ERICO representatives looked at the subject bus bar system and left it on site.

48.     The ERICO representatives also walked over to the closest other bus bar system 400 feet away, inverter station A2, which had a substantially similar FLEXIBAR assembly.

11

49.     The FLEXIBAR product at the A2 inverter station showed signs that it was on the verge of a similar failure at the area of a splice for one of the runs of FLEXIBAR, as shown in the below photograph:



50.     The following two photos show the same sleeved splice from A2, the top photo taken May 30, 2014 and the bottom photo taken August 6, 2014, after the subject electrical event, showing that the sleeve before the event was thick and undamaged, but the sleeve after the event was melting and thinning at the bolt points:

12



51.     The reason the sleeve was melting and thinning at the bolt points as of August 4, 2014, but were not as of May 30, 2014, is that the connection at the make-shift clamp splicing system allowed for overheating within the splice in that the splice was not designed so that it would be sufficiently even, tight, secure, and/or clean.

52.     At the A3 inverter station, the subject electrical event also occurred at the spliced connection of the FLEXIBAR in the wireway of that station, because of the same design problem as found at A2.

13

53.     After ERICO's investigation, ERICO representatives contacted Strata Solar, LLC via letter of August 19, 2014, essentially admitting that the incident involved an event whereby "one of the 3 power inverters had catastrophically overheated," and that it "appears to have initiated within the raceway between the inverter and the transformer."

54.     ERICO further admitted that "the most severe damage occurred where the FLEXIBAR had been spliced within the raceway; severe damage to the FLEXIBAR at the splice, holes in the raceway lid which appear to line up with the splices, and severe discoloration of the raceway frame are all evident."

55.     ERICO further admitted to the existence of "holes in the area of the splices and severe discoloration."

56.     ERICO further stated:

[W]e found that the heat shrink sleeve had been installed over the splices so tight that tips of multiple bolts were exposed through the sleeve, see pictures 5 through 8.

57.     It should be noted that these photographs referenced by ERICO were taken after the subject electrical event, not before, even though there are pre-event photos of the sleeves that do not show bolts exposed through the sleeve, such that ERICO's statement that "the heat shrink sleeve had been installed over the splices so tight that tips of multiple bolts were exposed through the sleeve," is a phenomenon that did not occur until after the subject event.

58.     ERICO further stated in its letter:

Furthermore, picture 9 taken by Joe Campannelli at the site illustrates how one of the bolts on the splice of Phase A (as identified when returned to ERICO) had melted through the heat shrink sleeve and started to melt into the insulation on the

14

adjacent FLEXIBAR of Phase C (as identified when returned to ERICO). Lastly, from the returned FLEXIBAR, we noted that the thickness of the heat shrink sleeve varied and was thinner on the backside than the front (pictures 10 – 11). When heated, heat shrink sleeves become thicker, therefore it appears that the heat was not evenly distributed around the entire splice and most likely compromised the performance of the sleeve.

From these observations, we believe the incident occurred from inadequate insulation on the FLEXIBAR spliced.

59.     The post-event conditions noted by ERICO – that the shrink-wrapped polymer sleeve was (a) tight enough to expose the metal at the bolts and (b) varied in thickness (being thinner on the backside than the front) – were conditions that developed not by the shrink-wrap process but by the fact that once the system was commissioned, the make-shift clamp splicing system developed hot spots that comprised the polymer sleeving.

60.     In addition, the splicing system caused the three runs of FLEXIBAR product to become extremely close together within the wireway or raceway, to the point that the splices were in contact or near contact to each other and to the frame of the wireway.

61.     The following post-event photo of the bus bars within the wireway at station A2 shows how close together the runs were to each other and to the wireway wall:



62.    ERICO knew that the three bus bar runs would be placed inside the wireway in this fashion, but advised of no concerns about any risks associated with that configuration.

63.    The damage to the polymer sleeving caused by the make-shift clamp splicing system eventually caused the metal brackets and/or bolts at the splice to be exposed to each other and/or to the frame of the raceway, which led to the electrical arcing event.

64.    As a result of the subject electrical event, Strata Solar, LLC incurred damages of $140,511.93.

65.    Strata Solar, LLC brings this action on its own behalf to the extent that it incurred a deductible of $54,561.84 out of the $140,511.93 in damages, and Strata Solar, LLC brings this action for the benefit of its subrogated insurance company, AXIS Specialty, which paid Strata Solar, LLC $85,950.09.

## COUNT I: BREACH OF EXPRESS WARRANTY

66.    Plaintiffs hereby incorporate by reference each and every allegation set forth above as fully as if recounted herein at length.

67.    ERICO designed, manufactured, supplied, and gave instruction and supervision on the installation of the subject FLEXIBAR product and its splicing system.

68.    Pursuant to the sale of the subject FLEXIBAR product and its splicing system, ERICO expressly warranted that the product was designed, manufactured, assembled, tested, supplied and/or installed in a workmanlike manner and free of defects and Strata Solar, LLC reasonably relied on such warranty.

69.    The subject FLEXIBAR product and its splicing system were designed, manufactured, assembled, supplied, and/or installed with a defect which existed when the product left ERICO's control.

70.    The subject FLEXIBAR product and its splicing system were defective in that it was designed and installed in such a manner as to leave it susceptible to damage in the course of the product's ordinary use.

71.    The contacts between this Defendant and Plaintiff's insured were sufficient for the express warranty to be directly conferred to Strata Solar, LLC by this Defendant and/or for this Defendant to be deemed a "seller" within the meaning of the applicable version of the Uniform Commercial Code ("UCC").

17

72.    The electrical event of August 5, 2014 was the result of a malfunction of or defect in the subject FLEXIBAR product and its splicing system in the course of its ordinary use.

73.    Strata Solar, LLC used the subject FLEXIBAR product for its intended purpose and/or for a purpose that was reasonably foreseeable by this Defendant.

74.    Defendant breached the above warranties by providing the product with a malfunction or defect.

75.    Upon discovery of the electrical event, Strata Solar, LLC notified ERICO of the problem.

76.    As a direct and proximate result of defendant's breach, Plaintiff sustained damage to its property set forth above.

WHEREFORE, Plaintiff respectfully requests the entry of a judgment in its favor and against this Defendant for damages in excess of $10,000 in addition to pre-verdict interest, post-verdict interest, and costs as allowed by law.

## COUNT II: BREACH OF IMPLIED WARRANTY

77.    Plaintiffs hereby incorporate by reference each and every allegation set forth above as fully as if recounted herein at length.

78.    ERICO designed, manufactured, supplied, and gave instruction and supervision on the installation of the subject FLEXIBAR product and its splicing system.

79.    Pursuant to the sale of the subject FLEXIBAR product and its splicing system, ERICO impliedly warranted that the product was designed, manufactured, assembled, tested,

18

supplied and/or installed in a workmanlike manner and free of defects and Strata Solar, LLC reasonably relied on such warranty.

80. The subject FLEXIBAR product and its splicing system were designed, manufactured, assembled, supplied, and/or installed with a defect which existed when the product left ERICO's control.

81. The subject FLEXIBAR product and its splicing system were defective in that it was designed and installed in such a manner as to leave it susceptible to damage in the course of the product's ordinary use.

82. The contacts between this Defendant and Plaintiff's insured were sufficient for the implied warranty to be directly conferred to Strata Solar, LLC by this Defendant and/or for this Defendant to be deemed a "seller" within the meaning of the applicable version of the Uniform Commercial Code ("UCC").

83. The electrical event of August 5, 2014 was the result of a malfunction of or defect in the subject FLEXIBAR product and its splicing system in the course of its ordinary use.

84. Strata Solar, LLC used the subject FLEXIBAR product and its splicing system for its intended purpose and/or for a purpose that was reasonably foreseeable by this Defendant.

85. Defendant breached the above warranties by providing the product with a malfunction or defect.

86. Upon discovery of the electrical event, Strata Solar, LLC notified ERICO of the problem.

19

87.     As a direct and proximate result of defendant's breach, Plaintiff sustained damage to its property set forth above.

WHEREFORE, Plaintiff respectfully requests the entry of a judgment in its favor and against this Defendant for damages in excess of $10,000 in addition to pre-verdict interest, post-verdict interest, and costs as allowed by law.

### COUNT III: NEGLIGENCE

88.     Plaintiffs hereby incorporate by reference each and every allegation preceding Count I as fully as if recounted herein at length.

89.     ERICO designed, manufactured, supplied, and/or gave instruction and supervision on the installation the subject FLEXIBAR product and its splicing system and placed it the stream of commerce; as such, ERICO had a duty to design, manufacture, test, assemble, install and/or issue warnings on the subject FLEXIBAR product and its splicing system in a workmanlike manner such that the product would be free of defects.

90.     The subject FLEXIBAR product and its splicing system were designed, manufactured, assembled, installed and/or supplied with a defect which existed when the product left ERICO's control.

91.     The subject FLEXIBAR product and its splicing system were defective in that it was designed and installed in such a manner as to leave it susceptible to damage in the course of the product's ordinary use.

92.     The electrical event of August 5, 2014 was the result of a malfunction of or defect in the subject FLEXIBAR product and its splicing system in the course of its ordinary use.

93. Strata Solar, LLC used the subject FLEXIBAR product and its splicing system for its intended purpose and/or for a purpose that was reasonably foreseeable by this Defendant.

94. The FLEXIBAR product and its splicing system were items of property that were not purchased with the rest of the inverter station, but were added to them after the purchase and installation of the inverter station.

95. The damages sought herein are to property other than the FLEXIBAR product and its splicing system.

96. The purpose of the used of the FLEXIBAR system was so that it could be serviced and/or replaced easily.

97. The FLEXIBAR system was not an integral component of the inverter station.

98. Defendant breached the above duties by providing the product with a malfunction or defect.

99. As a direct and proximate result of defendant's breach, Plaintiff sustained damage to its property set forth above.

WHEREFORE, Plaintiff respectfully requests the entry of a judgment in its favor and against this Defendant for damages in excess of $10,000 in addition to pre-verdict interest, post-verdict interest, and costs as allowed by law.

21

## DEMAND FOR JURY TRIAL

Plaintiff requests that jury try the issues.

Respectfully submitted this 7th day of July 2015.

By: _____

John W. Reis
NC Bar No. 25109
SMITH MOORE LEATHERWOOD LLP
101 North Tryon Street, Suite 1300
Charlotte, NC 28246
Telephone: (704) 384-2692
Facsimile: (704) 384-2939
Email: j.reis@smithmoorelaw.com
ATTORNEY FOR PLAINTIFF

CHARLOTTE 136367.1